Good morning. May it please the court, I'm Ronald Cohen and I'm appointed counsel for Mr. Robertson this morning, today. Last time I was here was seven years ago, so I'm glad that you finally invited me back. And I was before you, Judge Gregory, on that occasion. Let us start where this incident began, which was a radio report by an unknown individual that there were three black males wearing white t-shirts chasing a fourth individual, and that there was a gun involved in the incident. Who has the gun is completely unclear, at least it's unclear to me. With that, a number of marked police vehicles come into the area. The area is McDonald Terrace. I'm sorry ma'am, McDougal Terrace. I probably have it wrong all the way through, do I not? You do. Thank you. Well, we can agree, Judge Duncan, that this is the high crime area that's described by Officer Welch, that he finds is a I apologize to the citizens of Durham. So we have this non-specific report of these individuals. I would submit that that description is completely worthless as a description, that it has no specificity at all, and that it could fit any black male individual who happened to be wearing a white t-shirt anywhere in the so there is no way of distinguishing these people unless you are going to observe them in the act of chasing, okay? Once we get to the locusts in Quo, there is no chase taking place. There is nothing but quiet. The area is calm and quiet. There is no observable illegal activity going on. I believe that you can the record as Officer Welch saying that there were a group of targets that were evaluated and found not to be the people who were involved in the report, and then you can read the record as saying that police activity started to center on a bus shelter, which was in the area, and there were a bunch of individuals in the bus shelter. You're not challenging the stop. You're not challenging. I most certainly am challenging the stop. You didn't in your brief. I did challenge. Excuse me, the issue in your brief revolved around whether Mr. Robertson was free to leave at the time, and it was a little unclear to me, but it didn't seem to me that you argued the initial stop. It has to be in your statement of issues. Well, whether it is in the statement of issues or not, I mentioned and analyzed Terry v. Ohio. Okay, it does have to be included in your statement of issues. And also, did you argue the stop to the District Court? The stop was not, I believe, what was, I believe, to the District Court. I think if you see that that's part of the record below, that there was no basis for approaching Mr. Robertson. Now, that being... When you sit down, if you could just find that in the record, I would really appreciate it. I will make a point of searching for it, but, you know, what we come up with is we have the police who have concentrated on the bus shelter. Mr. Welsh's testimony is that there are already several officers involved in confronting people in the bus shelter who happen to wear white t-shirts. The disposition of that encounter is not clear to me from the record, but there is a police presence in the bus shelter, or around the bus shelter, and Robertson is sitting in the bus shelter. He is not wearing a white t-shirt. He is wearing a dark t-shirt. He is observably doing absolutely nothing. It is at this point with the other officers engaged with the other individuals. Well, let me backtrack a minute. Let us say that we are, I hesitate to do this, but we're a bunch of black people who live in the hood, in Durham, in an area which is under constant attack or constant presence of police officers. You're sitting in a bus shelter. You are surrounded by police, whether their guns are drawn or not. They're in uniform. Would you naturally pick yourself up and make yourself a shelter? I would say you would not. I would say that if you, in that experience, in that milieu, you would not make an example of yourself. You would not single yourself out by leaving the area, by just getting up and walking away. I don't think that that's unusual, and I submit without denigration that that is part of the black experience in this country, and I offer for at least some validation Judge Scheindlin's recent ruling in the Stop and Frisk case in New York, where she talks about, and among other things, the profiling that is inherent in such an activity. This arose in a context where three men were chasing another man, and they No, sir. I'm not saying that there's a policy in Durham of Stop and Frisk. I'm not talking about that. But my question is, I mean... Yes, I do. I do, in fact, Judge Wilson. You do? I mean, you're responding to what's been... that somebody's in distress? There's nobody in distress. Well, they don't know that. Well, it's open to their eyes, sir. You know, there's nobody chasing anybody. There's no activity whatsoever, and I say in my brief, having found no evidence of the activity that called them out, they didn't simply go back to their duties. They didn't simply go back to whatever they were doing before. They went and started an investigation. They had no cause to approach anybody. Well, I don't know what they said. I don't have a record for that. But my point is, what would have been wrong with that? I mean, approaching them is not the issue. I mean, is it? Well, in a certain context, it in fact may be, but I will leave the white t-shirt people aside. They're all there together, perhaps. Well, they're all there sitting in a bus shelter, just as in some random way, you, Judge Wilson, Judge Gregory, Judge Duncan ended up in this panel. I assume that the assignments are randomized. You know, these are just a bunch of random people sitting in a bus shelter. Well, so what's wrong approaching to try to find out if there's anybody in distress? Because there's observably nobody in distress. Does the citizen have a privilege to be free of government intrusion? Well, don't you have to have an articulable reason, Judge Wilson? The Supreme Court has said that brief encounters between police and citizens require no objective. Well, you know, we do not have, I'm not arguing about the other people or what happened to them. I'm saying that Mr. Jamal Antonio Robinson had no objective reason to leave the bus shelter. He had every reasonable reason to stay there, that he wasn't wearing a white t-shirt, that there was no reason to approach him. But let's go to the approach. According to the evidence, I'm losing my time. According to the evidence, he is six to ten feet away and his first inquiry is, do you have anything illegal on you? Well, you know, how loud was that? How loud was that question? Was it, do you have anything illegal on you? Do you have anything illegal on you? Do you have anything illegal on you? And then he makes a come here gesture. Yeah, that's a gesture of command. That's a gesture of seizure. That's an exercise of authority. That's an exercise of authority. Could I ask, because you are running out of time, it seemed to me that your focus was also on the reasonableness or unreasonableness of the search. The search is completely unreasonable. There's no predicate for for making a search because there's no predicate for making a seizure. There is no articulables, articulable fact in the record that says that Mr. Robinson was doing anything other than sitting in the bus shelter. I'm not here to propose him as a post child, as a good citizen, but it doesn't make any difference. That is one of the vices of the district court's opinion, as you will read the words reasonable innocent people. Innocent person should not have led. Well, you know, innocent is not part of the equation. It doesn't belong in reasonable person. You know, I'm an innocent person. I don't like the government harvesting my telephone calls. I don't like it. It's an intrusion. It's wrongful. I'm a guilty person. I like it even less. But it doesn't matter. That's not part of the equation. Now, if your honor would give me a minute, I would ask you to excuse my lapse in not citing to you earlier the Jones case, which is the March 2012 case, which was part of the 28 E or J letters that were sent to the court before oral argument that 678 F 3rd 293. If your honor would read Jones, I would think that your honor would see that Jones is very, very close, has a very, very close relationship to fact pattern in this case, and that the conclusion in Jones is the conclusion that should be reached in this case. The stop here was improper. The seizure here took place immediately on Mr. Robertson's being confronted by Officer Welsh. He admits that. Now, would a reasonable person believe that they were testified that he felt he was seized? That's in the record. He testified that he felt he was not free to leave. Although that's not. I'm sorry. Well, if there's a question, Judge, I'll be happy to try and answer it. Not at all. Thank you. Uh, Mr. Robinson certainly felt that he was not free to leave. And I would submit to you that under all the totality of circumstance this case, he was not free to leave. He wasn't free to leave before he was accosted by Officer Welsh. He was subject to whatever was going on in that bus shelter, which was confronted by a number of armed Durham police. I will reserve the balance of my time, and I will try and find what you asked for, Judge Judson. Thank you. Thank you. Mr. Cohen, Mr. DeFranco. May it please the Court, my name is Mike DeFranco, and I represent the United States of America in this matter. The government does not contend that Officer Welsh had reasonable or articulable suspicion to conduct a pat-down of Mr. Robertson. It's been the government's position all along that Officer Robertson had a consensual encounter. That the officers responded to McDougal Terrace, which is a high crime area, because they had gotten a call. And when they... And what was the call? What was the call? The call was a disturbance with a weapon involving three African-American males in white t-shirts chasing an individual with a gun at McDougal Terrace. They also indicated a location near Building 5. So that the officers went there, and of course that they need to go there. Well, if they don't go, what what happens? They have to go and investigate. Absolutely. They went to Building 5. They go to Building 5 in that vicinity. They see individuals that roughly match the description of the call. They approach the bus stop. Officer Welsh testified. How far is the bus stop from Building 5? Is it in the record? I don't recall if it's in the record. It's... The pulled in about a hundred yards from where the bus stop is. So I believe it's within the hundred yard range or so. But I don't recall specifically how far away it was. And there was much talk earlier about the wave. And the government points out that that's the reason for a wave. And I'm not saying this clearly, but when a district court hears the evidence and has the opportunity to observe witnesses testify in a demeanor, the district court is in the best position to determine exactly what that wave meant. Whether it was a wave of directive or a wave as in, hey would you mind coming over here and talking to me? And the government submits that Judge Schroeder was in the best position to observe the witnesses testify. He specifically found that Officer Welsh's version was to be credited, and that Mr. Robertson's version was not to be because you saw black males there, right? There were six or seven individuals standing around them around the bus stop according to Officer Welsh's testimony. Okay. There's nothing wrong with standing around a bus stop, correct? Absolutely not. No furtive activity, no one was running, nothing like that, all right? No. So the only thing was good police work, as I think Judge Wilson's question might suggest. Hey fellas, did you see anything or what's up, right? That's essentially what occurred. Okay, now was anybody searched there? Well, it was not clear what the other officers were doing. It wasn't clear. I'm speaking of Officer Welsh dealt with Mr. Robertson on a one-on-one basis. Yeah, but you can't do that out of the context. He's seeing all of this, right? So the milieu is important here. Weren't there other people being searched? Certainly the number of officers present is a factor that the courts considered. And they were searching the other people, correct? It's unclear whether they were searching the other people. They were talking to the other people, but Officer Welsh indicated that the other officers were dealing with the other individuals. It was unclear whether or not they were frisking them, just talking to them, or exactly what the other officers were doing. All right, so then they approach Mr. Robertson. Not they, only Officer Welsh approaches Mr. Robertson. And says what to him? From about a distance of 10 feet. He says, do you have anything illegal on you? And then... Anything illegal on you? Isn't that non-sequitur to, hey, did y'all say anything? It's an open-ended question, which it could mean marijuana, it could mean a gun. Presumably in this case... Why would you walk up to him and ask him that? Did the police in Durham ask that question to other people? No, I would submit that the reason why the questions were open-ended like that was because the call was somewhat unspecific, and they really didn't know. In fact, the call didn't even specifically identify who was chasing whom with a gun. It would stand to reason that the individuals in the white t-shirts were the ones chasing with the gun, but the call was unclear exactly how, who had the gun. So the Officer Welsh goes to investigate. He asks a question, do you have anything illegal on you? And he's standing about 10 feet away. He gets no response. Mr. Robertson... Why didn't he ask him, are you armed? That was the next question. Well, he didn't say that, actually. What he said was, do you mind if I search you? He didn't. He went to, do you have contraband, which means basically drugs, right? Not necessarily. It could be a firearm, a concealed firearm. It's an open-ended question. Do you have anything illegal on you? The United States, guns aren't illegal, necessarily. We've got an amendment in the Constitution that allows it. Not if the weapon is concealed. In the state of North Carolina, if he's carrying a concealed weapon in which the officers can't see it, that would be a violation Nonetheless, it's an open-ended question that the officers, there's no reason why an officer can't ask that question. Do you have anything illegal on you? He didn't ask him what his name was? No, he didn't. This was a matter of... He didn't ask him where he lived? He did not ask any of those questions. Those are the kind of questions that are normal, as Judge Duncan talked about, you have a right to approach people. But to walk up to someone and say, have you got anything illegal on you? That's pretty offensive, isn't it? It could be viewed as an officer was responding to a vicinity of a call of individuals with guns. So they were going to investigate. It's really, and it's, often times this case, this type of issue occurs in the context of an airport. Individuals arrive, officers approach and ask, hey, do you mind if I talk to you for a few minutes? I'm trying to stop the flow of drug traffic. Do you mind if I search you? That's the context in which it happens. Is that offensive? I'm sure it's offensive to many people. The question is, is it unlawful? Yeah, but that's different. That's random and you are using a form of transportation and we have determined that you can interdict and ask questions. But he's at a bus stop, a public bus stop. People who wait for the bus have to wait in the bus stop, don't they? Yes. In fact, it appeared that he was waiting at the bus stop. So why would you walk up to him just because he, I assume because he's black? No, because he was in the vicinity. So everybody in the vicinity, you would have said, do you have anything illegal? It's, while it may be offensive, the question is whether it's unlawful. And when I say offensive to the Constitution, I don't mean, obviously it's offensive to a person as a human being, of your humanity. I'm talking about the Constitution when I say offensive. Well, if someone is walking down the street and an officer walks up to that person and says, do you have anything illegal on you? That may be offensive to that person, but I don't view that as offensive to the Constitution. What did we say in Jones? In Jones, Jones was focused more on an officer who followed an individual. And the individual, I believe Mr. Jones, knew that he was being followed. And when the officer followed him, Mr. Jones pulled into a private property, and the officer pulled in behind Mr. Jones and blocked his ability to get out. I believe that that was the court's primary focus, was the blocking of the vehicle. Although there is some language in there that's helpful to you, that we don't, by merely approaching individuals in public places and putting questions to them, offend the Constitution. Right, it's a totality. I was on the Jones panel. Yes, Your Honor. I defer to Judge Gregory's question. I was on the Jones panel, and part of it was the man was carrying a pizza, and just because it was a call to a high-drug place, a high-crime place, they said, pull your shirt up. Yeah, that's the same thing you're saying. Do you have something illegal that had no connection at all with the investigation? It's the same thing. He said, pull your shirt up. The man was holding a pizza. He said, pull your shirt up. I'm going to show you your stomach. Now, I believe, was that not the case where he had New York plates? Right. And the officer started following him because he had New York plates. That's right. And Mr. Jones knew that the officer was following him. He pulled into private property, and the officer blocked him in. No, he pulled up alongside him. He pulled up alongside him. And, of course, the officer said he wasn't blocking. He was near him. And it doesn't make any difference about the blocking in that case, because they got out of the car. There was no indication that they were still trying to drive it. Two got out and went toward the apartment. This is the last guy. He has a pizza in his hand. He walks up to him and said, hey, pull your shirt up. Because he had a New York license, because he drove into the parking lot, and he said, yeah, pull your shirt up. I believe he said, hey, do me a favor, pull your shirt up. That's more directed. Officer Welsh asked a question. He said, do you have anything illegal on you? There's nothing unconstitutional. And then you said, I want to search you. No, then coupled with a hand wave, he said, I believe. Please come to me, right? Do you mind if I search you? What's the difference? Well, the difference is that, and as Judge Schroeder analyzed it, do you mind if I search you? Certainly the hand wave is a factor to consider in the totality of the circumstances. That's a directive. Well, it can be viewed as a directive. But the officer certainly couldn't search him from where he was standing, 10 feet away. There had to be either he had to approach Mr. Robertson or say, essentially, would you mind coming over here so I can search you? Well, the police officer directs me. He says, he's telling me to come to him. And the question is whether a reasonable person would feel free to decline that request. After you've seen all these other people being searched, that's the whole context of it. The police officer says, you have something illegal, no connection at all, you're not running, you're not chasing anybody. How do you get away from Jones? That's not in the record that the other people were being searched. That did not come out at the hearing. The exact words, I believe, from Officer Welch were that the other officers were dealing with the other individuals. They've been held. They were dealing with them. It's unclear as to what exactly that meant. But the question is, under the totality of the circumstances, the number of officers present, whether they pulled any weapons, the court found that they didn't pull any weapons, the court specifically found that no threats were made, no loud commands were made, and the District Court was in the best position to make those determinations when hearing the witness testimony. No threats were made. Officer Welch was a foot shorter than Mr. Robertson. He said it in a non-threatening manner. And while it may offend some people that an officer comes up to them and says, do you mind if I search you, it's not unconstitutional. I use an analogy that if you're in your house and an officer comes and knocks on your door and when you open the door, he points in the house and says, do you mind if I search your house? I submit a reasonable person would say, no, you can't search my house. You have a warrant. Now, this is a slightly different context, but you could argue that it's a less intimidating context because it's out in public where other people can see what's going on. The Constitution... I'm sorry. I have some questions about... Because I had a little trouble following the argument, I was unclear about what arguments were made to the district court and what arguments are made on appeal. Because it did seem... It wasn't clear to me from the district court's opinion about the focus on the activities prior to the waive and prior to the interaction. So the initial approach, for instance. Are all these presently before us on appeal? The issue in the district court was whether Mr. Robertson consented to being searched, as I recall. And then on appeal, it has become twofold. Whether he was seized and then whether he voluntarily consented. So it was framed more in the vein of did he consent to being searched by standing up, walking six or seven feet, putting his arms in the air and then turning around. But based upon the testimony that came out at the suppression hearing, the appeal became more of well, first of all, was he seized unlawfully when the officer approached him and asked him those two questions coupled with a hand wave? In addition to, was this a consensual encounter? Thank you. The problem comes... What are the options realistically for saying no to that? Realistically, the options are to say nothing. And admittedly, Officer Welch did testify that had Mr. Robertson declined, that he was not free to leave. If that, unfortunately, not unfortunately, but that is not the standard. The standard is what would a reasonable person do in Mr. Robertson's shoes? Not subjective, but objectively. Mr. Robertson, was he... Well, let me ask you this about that. I mean, if the officer understood the circumstances to be such that he was not free to leave, are we to say, well, the officer whose subjective belief is unreasonable? I mean... I mean, that asks... What that does, it seems to me, is ask us to say, well, the officer's belief is... Not unreasonable, irrelevant. Well, but the thing is, it's not irrelevant because he's looking at the circumstances himself, he's participating in these circumstances. And he's reading the body English and he knows what he said or what he hadn't said and whatever else has happened. And... He's made a determination that the fellow's not free to leave, and the determination he's made, the other fellow has picked up on, maybe. That certainly could be the case, but again, the district court, who hears the evidence and observes the witnesses testify, and in fact, Officer Welsh demonstrated what occurred. So, reading something on paper doesn't do justice to the way it actually occurred. There's an acquirer on that one. I agree with you. And... So, I understand. Well, the government understands that if it's in Officer Welsh's mind that he's not free to leave, that maybe that there's some kind of vibe coming off him that Mr. Robertson picked up on. But the fact of the matter is the way the evidence came out was that Welsh, who's a small man and was not intimidating, as the court found, was not raising his voice, was non-threatening and was the only one dealing with Mr. Robertson. The other officers were dealing with the other individuals. Asked two questions in a matter of seconds. Do you have anything illegal on you? And then when he got no response, which clearly indicates that Mr. Robertson knew that he didn't have to answer, and then he said, do you mind if I search you with the hand wave? I see that my time is up. I would ask to just finish that the real issue is what effect did that hand wave have? And the district court found that under the totality of the circumstances it did not make it a seizure. Well, it was clear that the police officer was not going to take silence as an answer. Which he had every right not to do. Because he didn't ask him. It would be different if he had said, what's your name? And he's silent. Because in some cases you have a duty to identify yourself. That wasn't the question. The question was he has every right not to answer that question. And the police officer demonstrated clearly your silence, which is a constitutionally protected right is not going to be enough. Because what he did was in response to the silence come here. Waving his hand. And absolutely it was conveyed. It was conveyed not just by some ambience but a clear gesture physically. And it's corroborated by the police officer as Judge Wilson was questioning you about. His conclusion that listen, he was not going to be free to leave. So that corroborates the circumstances of what was going around and his conditions. And he said because this would be a totally different case if he had said what's your name? Said nothing. Where do you live? But instead it was a question of incrimination. Clearly. Do you have anything illegal on you? That is the premium of constitutional rights. Said nothing. Police officer no. Come here. You're going to be searched. So what he did was for his own safety. You have to read in the paper how many times people may be shot for doing something that is considered to be furtive or coming toward me so okay you're going to search me anyway. And he turns around and said that's consensual? That's the case. Those are the facts of this case. In light of Jones. In light of Black. I don't think you cited Black. It was a wonderfully written opinion. Um I'm sorry did I say that? Go ahead. Again it was a question that Mr. Robertson did or did not have to answer. The next question there were only two questions asked. Do you mind if I search you? It was also a question that Mr. Robertson did or did not have to answer. And he chose to answer those and the court analyzed it under the totality of circumstances that it wasn't unnecessarily coercive it didn't raise his voice it was non-confrontational. Now it may have um and I understand the courts distinguish between offensive to the constitution and offensive it may have been offensive to Mr. Robertson or anyone else but the question is is it unlawful? And the government's position is that it was a consensual encounter and that it was not unlawful for the officer to do what he did. Thank you. Thank you. Mr. Franco. Mr. Cohen you have a few minutes reserved. Thank you sir. Um Judge Duncan I have to say I looked at the motion uh the notice of motion to suppress the notice of motion does not talk about Terry. I talk about Terry because Terry is uh one of the pivotal factors on which this case turns. Your honor may disagree that that's properly before you. No I was just trying to it was not your argument evolved or it took some different turns that I was trying to make sure what your focus was. I understood it to be on events after the initial approach but it doesn't matter. My argument is twofold. My argument and I extend Judge Gregory's point Mr. Robertson and those people in the courtroom believe and they knew that they knew that from common everyday experience. Mr. Robertson's common everyday experience knew told him taught him his life experience taught him that when you are confronted by authority you do not diss that authority. Of course he's not going to admit that he has contraband on him because that would be the height of foolishness. He is sitting there in that bus shelter hoping against hope to be completely ignored to enjoy the right of a citizen to be left alone. He doesn't get the right of a citizen to be left alone. He gets to be confronted. And when he's confronted by Officer Welch whether Officer Welch is three feet tall or nine feet tall Officer Welch is an authority figure. He is an authority figure. He has issued a command when he waves forward. Well we're going to Well that's why we're here before Your Honor Judge Wilson Well it's clearly erroneous. It's clearly erroneous. It doesn't take into account the totality of the circumstances and Mr. Robertson's life experience. It is an ivory tower view of what goes on down in the street. Now the government wants you to defer to the district court. I don't want you to defer to the district court because that's why I'm here because I think that the district court is wrong and that's why you're here to ride herd on the district court to make sure that they get it right. Okay? A reasonable innocent person would not feel. Well you know Robertson that in itself is clearly erroneous. That the court alone says the context of the situation at McDougald Terrace needs to be judged not only on a clearly erroneous standard but de novo. The legal issues are de novo. Is the court going to view Jamal Antonio Robinson in some sort of theoretic context or the way it really is at McDougald Terrace 24-7  Mr. Robertson's life. Mr. Robson That's not a legal issue the way you just phrased it. That's a factual question. Well you know we know who Mr. Robertson is. He's a convicted felon. He's had experience with law enforcement. Does that come into the context? A reasonable person who's had experience with law enforcement faced by authority knows what the consequences are. You don't have to really get into his mind very much. I didn't want to get into the debate of what a reasonable person is but I've never met one. I really think that if we're going to look at Mr. Robertson in some sort of condition where what would a reasonable person have done then we have to look at who a reasonable person is then we have to give flesh to that reasonable person then we have to say that a reasonable person who is completely generic who what was the title of that book who's the color of water a reasonable person who's the color of water would not then say gee I'm the subject of a criminal investigation I've been targeted in a criminal investigation no matter what I do I'm not walking away from this not until somebody is satisfied that I'm either not committing a crime or that I am committing a crime I'm seized I don't think you have to use a crystal ball to figure out that Jamal Antonio Robinson was seized from the point that officer Welsh addressed that question to him and that's what I have to say to your honors this afternoon and I appreciate the indulgence of you hearing me thank you thank you Mr. Cohen also likewise note that you were court appointed yes sir I want to especially thank you very much for accepting the appointment because we couldn't do our job without your help and also note Mr. DeFranco thank you for ably representing the United States I will accept every appointment that this court sends me without regard well we thank you so much we'll come down Greek Council and then proceed to our final case for the term
judges: Roger L. Gregory, Allyson K. Duncan, Samuel G. Wilson